## THE ADRIATIC.

(District Court, E. D. Pennsylvania. December 20, 1910.)

### No. 36.

TOWAGE (§ 12*)—INJURY TO TOW—LIABILITY.

 Injury to a steamship, while being taken out into the Delaware river from alongside a pier with the help of a tug, caused by her bow swinging against the cribbing outside the pier and the catching of her anchor on the piles of such cribbing, *held* due to the combined fault of the tug, in allowing the ship's stern to swing downstream, and of the steamship, whose engines were stopped by her master, which made her handling by the tug more difficult.

 [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 24–26, 29; Dec. Dig. § 12.*]

In Admiralty. Suit by Sivert O. Sovensen, master of the Norwegian steamship Olaf Kyrre, against the steam tug Adriatic. Decree for half damages.

Henry R. Edmunds, for libelant.

Howard H. Yocum, for respondent.

HOLLAND, District Judge. This libel is filed by the master of the steamship Olaf Kyrre against the steam tug Adriatic to recover damages for injuries sustained by the steamship in consequence of alleged negligence of those in charge of the steam tug, while taking the steamer out in the stream from Greenwich Pier No. 6, at Philadelphia, July 10, 1908, about 3:30 o'clock p. m.

The Olaf Kyrre is a Norwegian vessel, 320 feet long, 40 feet beam, and at the time of the accident she was loaded with coal bound outward for Cuba, and drawing 22 feet 11 inches of water. Her bridges were about 130 feet from her stem. The sheer of the bow commenced 30 or 40 feet from her stem, and the hawse pipes were approximately 2 feet aft the stem.

Greenwich Pier No. 6 is about 600 feet long, built on piles, through which the tide flows. There is no other pier below it. Coal chutes have been erected upon it, and in order to prevent vessels fastened alongside coming in contact with wings of these chutes at high tide, cribbing was built along the entire length of the wharf on the south side about 7 feet below the pier. This cribbing is constructed by sinking a row of piles 2 or 3 feet apart, upon which four or five pieces of 5-inch sheathing were bolted, extending from low to high water mark. The ends of the pilings extended above high water about 3 or 4 feet. The cribbing is protected at its outermost end by a cluster of piles, 14 or 15 in number, fastened by iron bands, and extend somewhat beyond the end of the pier.

The steamship on this afternoon was lying at the south side of the pier, bow in, and her stern inside about 50 feet from the end. The Adriatic had been employed to take the Olaf Kyrre out into the stream, and the master of the tug went on the upper bridge of the steamship and took charge. He first ordered the tug to be placed in position,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and the latter was accordingly made fast to the steamship on her port side aft as close to the stern of the steamship as it was possible to get with proper bearing for the tug's bow. The tug lay head on, pointing upstream, and was made fast by a line from her bow bitts to the port side bitt forward of the after poop on the Olaf Kyrre.

The steamship, as is customary under like circumstances, used her own engines in coming out of the dock. The tug made fast on her port quarter, being there for the purpose of holding her stern up against the ebb tide as the vessel came out into the stream, in order that she might go out parallel with the wharf and not catch in the piling along the side. Capt. Martin, of the tug, started the steamship slowly ahead for the purpose of straightening her, then stopped, and then started full speed astern. The captain of the tug was on the upper bridge, from which point he directed the movement of the steamship. There were upon the tug an unlicensed mate, engineer, fireman, and deckhand. The pilot master and third mate, the latter at the wheel, were on the lower bridge of the steamship, and the chief engineer was on deck amidships. Her chief officer and carpenter were stationed forward about 10 feet from the stem, the latter at the windlass to attend to the anchor and see that it remained in position.

These facts are practically undisputed, but from this point there is a conflict in the evidence as to what subsequently happened. The libelant contends that through the negligence of the tug in not pressing against the steamship in time as she moved out into the stream, her stern, as it came under the influence of the ebb tide, was carried down the river, throwing the starboard bow of the steamship in towards the piling, and causing her anchor to catch and jump along on top of the piles, pulling the chain of the anchor out, notwithstanding the efforts of the carpenter to prevent it; that the chief officer called out to those on the bridge that the anchor was caught, and that she was breaking down the fenders; and that the master of the steamship at once gave orders to stop the engines, which was done, but the steamship, from the momentum it had already acquired, continued to move somewhat slower out into the stream, the fluke of the anchor finally catching in the cluster of about 14 piles which were placed at the end of the pier, breaking them, and injuring the stanchions of the awning on the forecastle head, and bending the hawse pipe.

The contention of the defendant is that under the direction of the master of the tug, who was upon the upper bridge, the steamship was moving out of the dock safely, and that the master of the steamship stopped her engines; that this order was given prior to the collision of the anchor with the piling and before any damage was threatened to the ship; that in consequence of this order to stop the speed of the steamship was diminished, her stern was seized by the tide, and, notwithstanding the efforts of the tug on her port quarter to keep her stern up, her bow was forced against the side of the wharf, causing damage to the steamship and to the cluster of pilings at the end of the pier.

After an examination of the evidence offered by both the libelant and respondent, we concluded the tug, which was second largest at

this port, 86 feet over all and 24 feet beam, equipped with an engine of 350 horse power, and accustomed to this work, was able to have taken the steamer out with safety, if it had been properly and carefully managed; but the evidence clearly shows that before the engines were stopped the tug had permitted the stern of the steamship to swing down the stream, which resulted in throwing the starboard bow of the steamer in towards the piling and causing her anchor to catch and jump along on the top of the pilings. Upon this fact being reported to the master of the steamship, he ordered the engines to stop, which resulted in slowing down her movement out into the stream, and aggravated the situation which had been brought about by the negligence of the tug, and as the steamship passed out with her engines stopped the effect of the tide was to throw the stern further down the stream, which caused the fluke of the anchor to catch the cluster of 14 piles at the end of the pier, and this caused the greater part of the damage both to the vessel and the piling.

We conclude, therefore, that it was the negligence on the part of the tug in not properly holding the stern of the steamship against the tide, which threw the starboard bow of the steamship in towards the pilings; but if the engines had continued full speed astern the steamship could have been taken out more nearly parallel, and the stern of the vessel would not have been swept so far downstream, which undoubtedly aggravated the situation originally caused by the negligence of the tug. In other words, while the tug is in fault for permitting the stern of the steamer to swing down the stream, this was made more difficult to prevent by the unwarranted interference of the master of the steamship, by stopping his engines shortly before the bow of his vessel passed the outer cluster of pilings, and he was, to this extent, responsible for the damages which resulted from the fluke of the anchor catching in the cluster of the 14 piles at the end of the pier.

The damage caused by the accident was the result of the combined fault of the tug and the master of the steamship, so that each should be responsible for one-half the damages and costs.

Let a decree be drawn accordingly.